UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
                               :

IN RE YUKOS OIL COMPANY
SECURITIES LITIGATION          :        04 Civ. 5243 (WHP)

                            :        AMENDED
This Document Relates to:           MEMORANDUM AND ORDER
ALL ACTIONS               :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

WILLIAM H. PAULEY III, District Judge:

        Beginning in the fall of 2003, the stock price of Yukos Oil Company ("Yukos" or the "Company") dropped precipitously in response to various measures taken by the Russian Federation. In October 2003, the Russian Federation arrested Yukos' President, Mikhail Khodorkovsky ("Khodorkovsky"), and seized his equity holdings in the Company. Soon thereafter, the Russian Ministry of Taxation (the "Tax Ministry") charged Yukos with underpaying the previous years' taxes by approximately $27.5 billion and the Russian Federation confiscated Yukos' primary assets, sending the Company into an economic tailspin.

        The named plaintiffs ("Plaintiffs") in this securities fraud action purchased Yukos securities between January 22, 2003 and October 25, 2003 (the "Class Period"). They allege that Yukos, its outside auditor and certain of its executives and controlling shareholders knowingly concealed the risk that the Russian Federation would take action against Yukos by failing to disclose: (1) that Yukos had employed an illegal tax evasion scheme since 2000 (the "Tax Scheme Allegations"); and (2) that Khodorkovsky's political activity exposed the Company to retribution from the current Russian government (the "Political Activity Allegations"). Plaintiffs assert claims against all defendants pursuant to Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17

C.F.R. § 240.10b-5, and assert claims for control person liability against the officer and shareholder defendants pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).


PROCEDURAL HISTORY

On March 30, 2006 this Court issued a Memorandum and Order (the "March 30 Order") granting defendant Group Menatep Limited's ("Menatep's") motion to dismiss the Consolidated Amended Complaint (the "Complaint" or "Compl.") pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA") and Fed. R. Civ. P. 9(b), 12(b)(1) and 12(b)(6). See In re Yukos Oil Co. Sec. Litig., No. 04 Civ. 5243 (WHP), 2006 WL 800736 (S.D.N.Y. Mar. 30, 2006). This Court also granted in part and denied in part a motion to dismiss by defendants Yukos and Bruce K. Misamore ("Misamore," and together with Yukos, the "Yukos Defendants").[1] Specifically, all claims against the Yukos Defendants were dismissed except for Plaintiff Buinycki's securities fraud claims against Yukos arising out of the Tax Scheme Allegations. On April 3, 2006, Yukos filed a timely motion pursuant to Fed. R. Civ. P. 59 and Local Civil Rule 1.3 seeking reconsideration of the March 30 Order to the extent it denied any part of the Yukos Defendants' motion to dismiss.

For the reasons stated below, Yukos' motion for reconsideration is granted and the Complaint is dismissed in its entirety. To avoid the piecemeal issuance of memoranda and orders, this Court vacates its March 30 Order. This Amended Memorandum and Order constitutes the Court's determinations on the two motions to dismiss and Yukos' motion for reconsideration.

---

[1] The remaining, non-moving defendants, Khodorkovsky, Platon Lebedev and PricewaterhouseCoopers Russia, were not served with the Consolidated Amended Complaint.

BACKGROUND

I. The Parties

Yukos is a Moscow-based joint-stock company whose shares trade on the Russian stock exchange. (Compl. ¶ 31.) Yukos shares also trade indirectly on multiple European exchanges and over-the-counter in the United States as American Depository Receipts ("ADRs"). (Compl. ¶¶ 31, 183 & n.1.) At the beginning of the Class Period, Yukos was the largest oil producer in Russia. (Compl. ¶ 2.)

Khodorkovsky was Yukos' President, Chief Executive Officer and largest shareholder. (Compl. ¶¶ 10, 34.) The Complaint alleges that Khodorkovsky was part of a select group of Russian business leaders known as "oligarchs" who supported former Russian President Boris N. Yeltsin but were politically opposed to current Russian President Vladimir V. Putin ("Putin"). (Compl. ¶¶ 47, 85-87.) Misamore was the Chief Financial and Principal Accounting Officer of Yukos. (Compl. ¶ 36.) As such, he signed the Company's filings with the United States Securities and Exchange Commission ("SEC"). (Compl. ¶ 36.) The Complaint alleges that Khodorkovsky and Misamore were "directly involved in the day-to-day operations of the Company at the highest levels and [were] privy to confidential proprietary information." (Compl. ¶ 40.)

Menatep is a limited liability company organized under the laws of Gibraltar. (Compl. ¶ 32.) Khodorkovsy owned 28% of Menatep and Platon Lebedev ("Lebedev"), Menatep's Chief Executive Officer, owned 7%. (Compl. ¶¶ 32, 35.) Menatep owned and controlled 100% of Yukos Universal Ltd., which owned and controlled 61% of Yukos. (Compl. ¶ 32.)

Plaintiff Mykola Buinycki ("Buinycki") is a citizen of the United Kingdom who resides in Moscow and invested in Yukos ADRs. (Compl. ¶ 28; Certification of Mykola

Buinycki, dated Aug. 17, 2004; Memorandum of Yukos Oil Company and Bruce K. Misamore in Support of Motion to Dismiss ("Yukos Defs. Mem.") at 40 n.48.)  Plaintiff Roxwell Holdings Limited ("Roxwell Holdings") is a Bahamian corporation that purchased Yukos common stock on the Russian stock exchange during the Class Period.  (Compl. ¶¶ 27, 183; Certification of Roxwell Holdings Limited, dated June 30, 2004 ("Roxwell Holdings Cert.").)

The Complaint describes Plaintiff Parsimony Ltd. ("Parsimony") as "a New York based corporation."  (Compl. ¶ 29.)  However, Parsimony is registered in the Channel Islands (Declaration of Luca Padulli, dated July 29, 2005 ("Padulli Decl.") ¶ 3) and its principal place of business and corporate headquarters, if any, have not been disclosed.  The sole shareholder of Parsimony is Luca Padulli ("Padulli"), an Italian citizen who "resided" in New York during the Class Period and continues to do so "for at least five months per year."  (Padulli Decl. ¶¶ 2-3.)

From New York, Padulli executed all of Parsimony's securities transactions that are at issue in this action.  (Padulli Decl. ¶¶ 4-5.)  Specifically, Padulli purchased bonds that were convertible into Yukos common stock.  (Padulli Decl. ¶ 4; Certification of Adam Kinzer, dated Aug. 31, 2004 ("Parsimony Cert.").)  The bonds were issued by a Swiss financial institution, UBS AG, and traded exclusively on the Luxembourg Stock Exchange.  (Andreeva Decl. Ex. QQ: Bond Offering Mem., dated Aug. 29, 2001.)  Because the bonds were not registered in the United States, they bore the restriction that they could "not be offered, sold or delivered within the United States or to U.S. Persons (as defined in Regulation S under the Securities Act . . .)." (Andreeva Decl. Ex. QQ.)  Parsimony's investments were managed by Chasm Lake Management Services, LLC, a company based in New York.  (Padulli Decl. ¶ 3.)

Together, these three Plaintiffs seek to represent a class of all entities and individuals that purchased these securities during the Class Period and were damaged thereby. (Compl. ¶ 182.)

4

II.  The Tax Scheme Allegations

At all relevant times, the Tax Code of the Russian Federation prescribed a maximum income tax rate that incorporated two components:  a tax payable to the federal budget and a tax payable to the budget of the taxpayer's local region.  For example, in 2004, the statutory maximum rate was 24%, of which up to 6.5% could be collected by the federal government and up to 17.5% by regional governments.  Russian Fed'n Tax Code Art. 284 § 1 (attached to the Declaration of Yulia Andreeva, dated June 3, 2005 ("Andreeva Decl.") as Ex. A).  The Tax Code also prescribed a minimum rate for taxes payable to regional governments. In 2004, that rate was 13.5%.  Russian Fed'n Tax Code Art. 284 § 1.  However, the regional governments could offer tax benefits to reduce or even eliminate the regional budget liability of certain categories of resident taxpayers.  Russian Fed'n Law of Enter. & Org. Profit Tax Art. 6 § 9 (Andreeva Decl. Ex. B).  As a result of this regional variance in the effective income tax rate, taxpayers in the metropolitan regions of the Russian Federation, such as Moscow, paid higher taxes than taxpayers in remote regions, or "ZATOs."[2]  (Compl. ¶ 61.)

Plaintiffs allege that from 2000 through 2003, Yukos grossly underpaid its taxes to the Russian Federation by illegally taking advantage of the ZATOs' preferential tax treatment. (Compl. ¶¶ 7, 61-64.)  According to the Complaint, Yukos booked oil sales at "well below" market prices to seventeen trading companies, all of which were registered within ZATOs. (Compl. ¶¶ 7, 62.)  Without taking physical possession, the trading companies sold the oil to customers at market prices and claimed the tax benefits of their ZATOs.  (Compl. ¶¶ 7, 63.) However, the profits were "funneled . . . back to Yukos through defendant Menatep" and Yukos

---

[2]  "ZATO" is an acronym for Zakrytye Administrativno-Territorial'nye Obrazovaniia, or "closed administrative-territorial formation."  The Soviet Union constructed these once-secret territories for state-sponsored academic, scientific or military activities.

paid taxes only on the initial below-market sales while reaping substantial profits from the low-tax market-price sales.  (Compl. ¶¶ 7, 62-63.)

Moreover, the Complaint alleges, the regional trading companies received the benefits of ZATO registration illegitimately because "[n]o business was actually conducted by the sham companies in the ZATOs" and they "did not process, store, or transport any oil products in the ZATOs."  (Compl. ¶ 64.)  As such, each "was an empty shell and an alter ego of Yukos and Menatep."  (Compl. ¶¶ 7, 61.)  Plaintiffs further assert that Menatep controlled "the main bank" through which profits were allegedly redirected to Yukos.  (Compl. ¶ 32.)

Plaintiffs allege that Defendants knew that the Yukos tax strategy presented enormous risk because it violated Russian law and because the Russian Federation had prosecuted other companies engaged in similar schemes.  (Compl. ¶¶ 8, 77-80.)  Plaintiffs claim that one of those companies, Lukoil, was a Yukos competitor and another, Business Oil Limited Liability Company ("Business Oil") was controlled by Yukos.  (Compl. ¶¶ 68-72, 81-83.)  Nonetheless, the Complaint alleges, Yukos issued materially misleading public statements that failed to disclose the risks or pertinent details of its tax strategy.

On February 13, 2003, Yukos reported earnings of $1.3 billion and net profits of $850 million for the third quarter of 2002.  (Compl. ¶¶ 5, 100.)  The Company explained that its profits were "pushed down" as a result of a "one time" recognition of taxes that Yukos had deferred during the consolidation of its production facilities.  (Compl. ¶¶ 5, 100.)  Khodorkovsky and Misamore reiterated these third-quarter financial results at an April 3, 2003 presentation to investors in London, but cautioned investors about the risk of increased tax liability "if regional income tax benefits were eliminated."  (Compl. ¶ 102.)  On April 24, 2003, Yukos announced that it would pay a dividend because of its strong financial results.  (Compl. ¶ 104.)

On May 19, 2003, Yukos reported a net profit of $988 million and earnings per share of $0.46 for the fourth quarter of 2002.  (Compl. ¶ 106.)  The Company also published its yearly results, reporting net income of $3.058 billion and earnings per share of $1.42.  (Compl. ¶ 106.)  Yukos certified that these results conformed to U.S. Generally Accepted Accounting Principles ("GAAP").  (Compl. ¶ 106.)  That same day, Yukos issued its 2002 Annual Report, which was signed by Misamore and filed with the SEC.  (Compl. ¶ 108; Andreeva Decl. Ex. I.)  In the Management's Discussion and Analysis section of that document, Yukos reported effective tax rates of 18.2% for 2001 and 19.6% for 2002 due to "the lower tax rates for certain subsidiaries in several tax jurisdictions both within Russia and internationally."  (Compl. ¶ 108; Andreeva Decl. Ex. I at 22.)  The Annual Report assured investors that Yukos transacted business with related parties "on an arm's-length basis" and certified that the Company's results comported with "established international accounting principles."  (Compl. ¶¶ 107-10.)

On July 7, 2003 and October 20, 2003, Yukos reported its financial results for the first and second quarters of 2003, respectively.  (Compl. ¶¶ 114, 116.)  The results, which were purportedly prepared in conformity with U.S. GAAP, reported increased net earnings and earnings per share.  (Compl. ¶¶ 114, 116.)  In the October earnings release, Yukos proclaimed that "profitability remains fairly high . . . and we are not expecting it to deteriorate."  (Compl. ¶ 116.)

Plaintiffs allege that because the Company employed an "illegal tax scheme," the above statements overstated net profits and understated tax obligations.  (Compl. ¶¶ 103, 105, 111, 117.)  Moreover, the Complaint alleges that the Company's financial statements were not prepared in conformity with U.S. GAAP or other standards of financial reporting.  (Compl. ¶¶ 103, 115, 117, 144-58.)  Finally, Plaintiffs allege that the Company's representations regarding its effective tax rates should have disclosed that Yukos achieved those rates through "paper

transactions" with "sham companies" at "well below-market prices."  (Compl. ¶¶ 7, 61-64, 111(f).)

III.  The Political Activity Allegations

Plaintiffs allege that at a secret meeting with Khodorkovsky and other oligarchs in 2000, Putin promised not to investigate potential wrongdoing at their companies if the oligarchs refrained from opposing Putin.  (Compl. ¶¶ 9, 88.)  Nearly three years later, at another such meeting, Khodorkovsky allegedly voiced his opinion that high-level officials in Putin's government should be ousted.  (Compl. ¶ 94.)  The Complaint alleges that Putin reacted negatively and intimated to Khodorkovsky that the Russian Federation might investigate Yukos' methods of acquiring oil reserves.  (Compl. ¶ 94.)  Despite Putin's warnings, Khodorkovsky publicly criticized Putin and financed opposition parties throughout the Class Period.  (Compl. ¶¶ 9, 93-97.)

On January 22, 2003, Yukos issued a press release stating that the Company does not finance political parties and that "[w]hile they are at work, Company employees are prohibited from engaging in political activities . . . . Any professional political activity is incompatible with work at the Company."  (Compl. ¶ 99.)  Plaintiffs allege that this statement, together with Yukos' financial reports, were materially false and misleading because they failed to disclose that Khodorkovsky was actively engaged in "professional political activities" and that those activities, coupled with Putin's alleged threats, created a material risk to Yukos shareholders.  (Compl. ¶¶ 9, 88, 93-98, 103(b), 105(c), 111(l), 115(a).)

IV.  The Russian Federation's Enforcement Measures

On October 25, 2003, Russian Federation authorities arrested Khodorkovsky and charged him with fraud, embezzlement and evasion of personal income taxes.  (Compl. ¶¶ 10, 118.)  Days later, the Russian Government seized control of Khodorkovsky's 44% interest in Yukos as security against the approximately $1 billion he owed in taxes.  (Compl. ¶¶ 11, 121.)  Concurrently, the Tax Ministry revealed that it had been investigating Yukos' tax strategies.  (Compl. ¶ 10.)  The Department of Information and Public Relations of the General Prosecutors Office released a 30-page report that, inter alia, accused Khodorkovsky and Lebedev of fraudulently operating an illegal scheme at Yukos to avoid tax liability through shell company transactions.  (Compl. ¶ 12.)

On December 29, 2003, the Tax Ministry concluded its audit of Yukos for tax year 2000 and issued a report (the "December 2003 Report").  (Compl. ¶ 14; Andreeva Decl. Ex. Q.)  According to that report, Yukos implemented "an illegal tax evasion scheme by means of artificially founding dummy companies in the oil and afterproduct movement chain and registering them in territories with preferential tax treatment."  (Andreeva Decl. Ex. Q at 7.)  In short, the Tax Ministry found that the transfer of oil through the seventeen regional trading companies was an "illusion" because Yukos was "the true owner of the oil and afterproducts."  (Andreeva Decl. Ex. Q at 8.)  Yukos controlled each of the entities involved in these purported transactions and the entities "performed no activities in the place of their registration."  (Andreeva Decl. Ex. Q at 9.)  Thus, the Tax Ministry concluded, Yukos had illegally obtained the benefit of the ZATOs' preferential tax treatment and owed $3.4 billion to the Russian Federation in back taxes, interest and penalties for tax year 2000.  (Compl. ¶ 14; Andreeva Decl. Ex. Q at 7-8, 104-05.)  The Tax Ministry followed the December 2003 Report with a formal decision (the "April 2004 Resolution" or "Business Oil") that expanded on the foregoing

9

findings.  (Compl. ¶¶ 14, 65-67; Andreeva Decl. Ex. T.)  In May 2004, the Moscow Arbitration

Court agreed with the Tax Ministry and ordered Yukos to pay the amount assessed.  (Compl. ¶

16; Andreeva Decl. Ex. X.)  The Tax Ministry subsequently revealed that Yukos had used the

same tax evasion scheme from 2001 to 2003, creating a total tax liability of $27.538 billion.

(Compl. ¶¶ 16, 76, 128.)

   As a result, Yukos defaulted on a $1 billion loan from private lenders and the

Russian Government confiscated Yukos' assets, including its main production facility and

billions of dollars from its bank accounts.  (Compl. ¶¶ 17-19, 31, 126-27.)  The price of Yukos

securities "plummeted" in response to these events.  (Compl. ¶¶ 21, 120, 122, 129.)

   Plaintiffs filed the first of these consolidated putative class actions on July 2,

2004.  Of pertinence to the present motions, Plaintiffs assert securities fraud claims for primary

liability under § 10(b) and Rule 10b-5 against all Defendants, and claims for control-person

liability under § 20(a) against Misamore and Menatep.

DISCUSSION

   Defendants raise three principal arguments in their motions to dismiss.  First, they

contend that that this Court must abstain under the act of state doctrine.  Second, they assert that

federal subject matter jurisdiction is lacking for two of the three named plaintiffs.  Finally, they

argue that the Complaint fails to state a claim for either primary violations of the securities laws

or control person liability.

I. The Act of State Doctrine

   Firmly entrenched as a principle of jurisprudence, the act of state doctrine

prevents the courts of the United States from "question[ing] the validity of public acts (acts jure

10

imperii) performed by other sovereigns within their own borders." Republic of Austria v. Altmann, 541 U.S. 677, 700 (2004); see, e.g., Underhill v. Hernandez, 168 U.S. 250, 252 (1897) ("Every sovereign state is bound to respect the independence of every other sovereign state, and the courts of one country will not sit in judgment on the acts of the government of another, done within its own territory."). The doctrine "has its roots, not in the Constitution, but in the notion of comity between independent sovereigns." First Nat'l City Bank v. Banco Nacional de Cuba, 406 U.S. 759, 765 (1972); see Oetjen v. Cent. Leather Co., 246 U.S. 297, 303-04 (1918); Wiwa v. Royal Dutch Petroleum Co., 226 F.3d 88, 100 (2d Cir. 2000). It also venerates the separation of powers within the federal Government by precluding the judiciary from deciding matters of foreign policy that are properly the province of the executive and legislative branches. See Alfred Dunhill of London, Inc. v. Republic of Cuba, 425 U.S. 682, 697 (1976); Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 423 (1964); Bi v. Union Carbide Chems. & Plastics Co., 984 F.2d 582, 586 (2d Cir. 1993). "If adjudication would embarrass or hinder the executive in the realm of foreign relations, the court should refrain from inquiring into the validity of the foreign state's act." Allied Bank Int'l v. Banco Credito Agricola de Cartago, 757 F.2d 516, 521 (2d Cir. 1985). The burden of establishing the doctrine's applicability to a particular dispute rests with the party that invokes it. Bigio v. Coca-Cola Co., 239 F.3d 440, 453 (2d Cir. 2001); Republic of Philippines v. Marcos, 806 F.2d 344, 359 (2d Cir. 1986).

Defendants urge this Court to abstain under the act of state doctrine because "[t]he adjudication of this dispute inevitably will require this Court to inquire into the actions and motives of the Russian Government in imposing confiscatory tax levies, penalties and interest on Yukos." (Yukos Defs. Mem. at 30.) Implicit in their argument and resplendent in other portions of their motion papers is the notion that the Russian Federation targeted Yukos unforeseeably

and that the Tax Ministry's interpretation of the Russian Federation Tax Code was without precedent.

Defendants have not cited any precedent invoking the act of state doctrine to abstain from adjudicating a securities fraud action.  Under the arguments advanced by Defendants, the doctrine would mandate abstention from any action in which a foreign corporation is alleged to have concealed conduct deemed illegal by its home country upon a defendant's mere assertion that the sovereign's determination was in error.  Such an application of the act of state doctrine would effectively insulate foreign corporations from a large swath of securities fraud claims by United States investors.

The act of state doctrine does not preclude a court from deciding a case that implicates the motives or justifications of a foreign sovereign's official act but does not seek to invalidate or circumvent that act.  W.S. Kirkpatrick & Co. v. Envtl. Tectonics Corp., Int'l, 493 U.S. 400, 401, 409 (1990) (holding that the doctrine does not bar "a court in the United States from entertaining a cause of action that . . . require[s] imputing to foreign officials an unlawful motivation . . . in the performance of . . . an official act").  Rather, the doctrine applies only "when a court must decide – that is, when the outcome of the case turns upon – the effect of official action by a foreign sovereign."  W.S. Kirkpatrick, 493 U.S. at 406; accord United States v. Giffen, 326 F. Supp. 2d 497, 503 (S.D.N.Y. 2004) (holding the act of state doctrine inapplicable to the criminal prosecution of a U.S. citizen on charges that he bribed Kazakh officials because the Court would "not need to rule on the legality of any public acts by the Kazakh government").  The act of state doctrine does not compel abstention from "cases and controversies that may embarrass foreign governments, but merely requires that, in the process of deciding, the acts of foreign sovereigns taken within their own jurisdiction shall be deemed valid."  W.S. Kirkpatrick, 493 U.S. at 409.

The Yukos Defendants contend that "any defense by Yukos beyond the pleadings stage necessarily will involve its claims that it was denied due process, and that it never would have suffered the consequences of having its business confiscated, had the Russian government properly applied Russian law." (Reply Memorandum of Yukos Oil Company and Bruce K. Misamore in Support of Motion to Dismiss at 11.) However, whether Yukos received due process in Russia is irrelevant. Neither party in this action seeks to enforce or disturb the actions taken by the Russian Federation. Cf. Norex Petroleum Ltd. v. Access Indus., Inc., 416 F.3d 146, 160 (2d Cir. 2005) (remanding for a determination as to whether plaintiff received due process in connection with an adverse Russian judgment to which defendants asked the court give preclusive effect). Moreover, in this action, the pertinent loss-causation inquiry concerns Defendants' alleged misstatements or omissions and the losses suffered by Yukos investors – not the propriety of the Russian Federation's tax enforcement and penal actions. The central question is whether Defendants acted with fraudulent intent in withholding information from the investing public. Even if Defendants prevail with their arguments that the Russian Federation's interpretation of Russian law was untenable, the validity of the Russian Federation's acts would be unaffected. See United States v. Merit, 962 F.2d 917, 921 (9th Cir. 1992) (holding that, because of the act of state doctrine, the court regards as valid South Africa's failure to issue a warrant of extradition "[e]ven if the Republic did disregard its own laws" in doing so).[3]

---

[3]  The act of state doctrine has been described alternatively as a rule of decision and as a principle of abstention. Compare Sosa v. Alvarez-Machain, 542 U.S. 692, 726 (2004); W.S. Kirkpatrick, 493 U.S. at 406; Sabbatino, 376 U.S. at 427, with First Nat'l City Bank, 406 U.S. at 763; JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V., 412 F.3d 418, 422 (2d Cir. 2005); Banco Nacional de Cuba v. Chemical Bank New York Trust Co., 822 F.2d 230, 235 (2d Cir. 1987). See generally Bigio, 239 F.3d at 452 n.7. Without resolving this disparity, this Court notes that it would have to presume the validity of the Russian Federation's actions if the doctrine emodies a rule of decision. See, e.g., W.S. Kirkpatrick, 493 U.S. at 409.

Likewise, a judgment in favor of Plaintiffs would not be tantamount to a ratification of the Russian Federation's actions.

Additionally, the Yukos Defendants cite <u>Pasquantino v. United States</u>, 125 S.Ct. 1766 (2005), for the proposition that the common-law "revenue rule" militates against inquiring into the tax policies of foreign governments.  (Yukos Defs. Mem. at 35-36.)  The Second Circuit has explained the interplay between the act of state doctrine and the revenue rule as follows:

> Under the act-of-state doctrine, the assessment of the validity of a foreign law is limited to its application within the sovereign's territory; under the revenue rule, United States courts avoid the application of a foreign sovereign's tax laws in the United States. Both approaches enable courts to avoid entanglement with questions about the underlying validity of a foreign sovereign's laws.

<u>Attorney Gen. of Canada v. R.J. Reynolds Tobacco Holdings, Inc.</u>, 268 F.3d 103, 126 (2d Cir. 2001).  Thus, in <u>Pasquantino</u>, the Supreme Court held that the United States Government could prosecute individuals for evading Canadian liquor taxes under this country's mail and wire fraud statutes because the "prosecution pose[d] little risk of causing the principal evil against which the revenue rule was traditionally thought to guard: judicial evaluation of the policy-laden enactments of other sovereigns."  125 S.Ct. at 1779.  So too, because Plaintiffs here are not asking this Court to enforce the Russian tax judgments, this Court need not evaluate the policies behind the Russian Federation's tax legislation or the regional variance among effective federal income tax rates which Yukos is alleged to have exploited.  As such, the revenue rule is inapposite.

In sum, this Court is not being called on to either invalidate or enforce the Russian Federation's measures, nor will the validity of those sovereign acts have any bearing on Defendants' motions to dismiss or on questions likely to affect the merits of this litigation.  <u>See also</u> <u>In re Yukos Oil Co.</u>, 321 B.R. 396, 409-10 (S.D. Tex. 2005) ("Although the acts of the

Russian government doubtless have a significant impact upon the efforts of Yukos to reorganize itself financially, the filing and conduct of this Chapter 11 case does not in itself require that the court sit in judgment on those acts.").  As such, the act of state doctrine does not warrant abstention.

II.  <u>Subject Matter Jurisdiction</u>

Defendants contend that this Court lacks subject matter jurisdiction over the claims of two of the three named Plaintiffs, Roxwell Holdings and Parsimony – foreign entities whose transactions in Yukos securities during the Class Period have significant foreign aspects.

A.  <u>Legal Standards</u>

In determining whether subject matter jurisdiction exists, "the court may resolve disputed jurisdictional fact issues by reference to evidence outside the pleadings."  <u>Filetech S.A. v. France Telecom S.A.</u>, 157 F.3d 922, 932 (2d Cir. 1998) (internal quotation and citation omitted); <u>accord</u> <u>Reiss v. Societe Centrale Du Groupe Des Assurances Nationales</u>, 235 F.3d 738, 748 (2d Cir. 2000).  "[T]he plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists."  <u>Luckett v. Bure</u>, 290 F.3d 493, 497 (2d Cir. 2002); <u>accord</u> <u>Makarova v. United States</u>, 201 F.3d 110, 113 (2d Cir. 2000).

"[W]here 'a court is confronted with transactions that on any view are predominantly foreign, it must seek to determine whether Congress would have wished the precious resources of United States courts . . . to be devoted to them rather than [to] leave the problem to foreign countries.'"  <u>SEC v. Berger</u>, 322 F.3d 187, 192 (2d Cir. 2003) (quoting <u>Bersch v. Drexel Firestone, Inc.</u>, 519 F.2d 974, 985 (2d Cir. 1975)).  These concerns are particularly acute in the context of a class action, where a minimal nexus to the United States

could be "a very small tail . . . wagging an elephant." IIT v. Vencap, Ltd., 519 F.2d 1001, 1018

n.31 (2d Cir. 1975); see Berger, 322 F.3d at 195 (acknowledging divergent standards for subject

matter jurisdiction in securities fraud individual actions and class actions).

   To determine if subject matter jurisdiction extends to predominantly foreign

claims, courts in this Circuit consider: "(1) whether the wrongful conduct occurred in the United

States, and (2) whether the wrongful conduct had a substantial effect in the United States or upon

United States citizens." Berger, 322 F.3d at 192; see also Europe & Overseas Commodity

Traders, S.A. ("EOC") v. Banque Paribas London, 147 F.3d 118, 128-29 (2d Cir. 1998);

Psimenos v. E.F. Hutton & Co., 722 F.2d 1041, 1045 (2d Cir. 1983).  These inquiries are

respectively known as the "conduct test" and the "effects test." Itoba Ltd. v. Lep Group PLC, 54

F.3d 118, 121-22 (2d Cir. 1995); In re Bayer AG Sec. Litig., No. 03 Civ. 1546 (WHP), 2005 WL

2222273, at *5 (S.D.N.Y. Sept. 14, 2005).


  B.  The Conduct Test

   Subject matter jurisdiction lies under the conduct test "only when substantial acts

in furtherance of the fraud were committed within the United States." Psimenos, 722 F.2d at

1045; see also Berger, 322 F.3d at 193.  This threshold is met if "(1) the defendant's activities in

the United States were more than merely preparatory to a securities fraud conducted elsewhere,

and (2) these activities or culpable failures to act within the United States directly caused the

claimed losses." Itoba, 54 F.3d at 122 (internal quotations and citations omitted); see also

Berger, 322 F.3d at 193; In re Vivendi Universal, S.A. Sec. Litig., No. 02 Civ. 5571 (RJH), 2004

WL 2375830, at *3 (S.D.N.Y. Oct. 22, 2004).  In securities fraud class actions, "courts assessing

subject matter jurisdiction under the conduct test often have focused on the location from where

allegedly false statements emanated and the circumstances of the statements' dissemination,

since this conduct . . . typically embodies the heart of the alleged fraud." Vivendi Universal, 2004 WL 2375830, at *5 (collecting cases); see Bayer, 2005 WL 2222273, at *6; Froese v. Staff, No. 02 Civ. 5744 (RO), 2003 WL 21523979, at *2 (S.D.N.Y. July 7, 2003); Nathan Gordon Trust v. Northgate Exploration, Ltd., 148 F.R.D. 105, 108 (S.D.N.Y. 1993).

         All of Defendants' alleged misstatements emanated from abroad.  (See Compl. ¶¶ 99-116.)  Cf. Cromer Fin. Ltd. v. Berger, 137 F. Supp. 2d 452, 480 (S.D.N.Y. 2001) ("Although the named plaintiffs are foreign citizens, and the Fund operated as an off-shore fund, the fraud was run from the United States and it was the decisions made in the United States that led directly to the investors' losses."); In re Gaming Lottery Sec. Litig., 58 F. Supp. 2d 62, 74 (S.D.N.Y. 1999) (finding subject matter jurisdiction because the corporation's "activities within this nation's borders are the very factual predicates of fraud which lie at the heart of plaintiffs' case").  Although the Complaint alleges that Yukos filed its 2002 Annual Report with the SEC in the United States (Compl. ¶ 108), that document is not alleged to have been prepared in the United States.  This Court is cognizant that "the situs of preparations for SEC filings should not be determinative of jurisdictional questions."  Itoba, 54 F.3d at 124.  However, in this putative class action challenging a raft of allegedly misleading statements, a single SEC filing by a foreign corporation is not a "substantial act[] in furtherance of the fraud" sufficient to confer federal subject matter jurisdiction.  See Bersch, 519 F.2d at 987; Bayer, 2005 WL 2222273, at *6; Interbrew S.A. v. Edperbrascan Corp., 23 F. Supp. 2d 425, 432 (S.D.N.Y. 1998); Nathan Gordon Trust, 148 F.R.D. at 108.

         Parsimony's sole shareholder, Padulli, attests that Yukos contacted him by e-mail while he was in the United States to inform him of the release of the Company's financial results and to invite him to participate in conference calls.  (Padulli Decl. ¶¶ 6-7.)  These acts were purely incidental to the misstatements alleged in the Complaint, all of which occurred in Russia.

Moreover, Yukos had no reason to expect that by sending such emails it was engaging in conduct in the United States.  As discussed above, the bonds that Parsimony purchased were expressly restricted to non-"U.S. Persons" by Regulation S, were issued by a Swiss corporation and traded exclusively on the Luxembourg Stock Exchange.  (Andreeva Decl. Ex. QQ.)  Even if UBS was aware of Padulli's New York residence, as Plaintiffs protest, Plaintiffs have not alleged that any of the defendants were.

       The Complaint also alleges that Yukos solicited investors in the United States through the personal appearances of executives such as Khodorkovsky and Misamore at meetings, presentations and industry conferences.  (Compl. ¶¶ 54-56.)  In <u>EOC</u>, the Second Circuit held that subject matter jurisdiction may lie if, "in addition to communications with or meetings in the United States" wherein allegedly fraudulent misstatements were made, "there has also been a transaction on a U.S. exchange, economic activity in the U.S., harm to a U.S. party, or activity by a U.S. person or entity meriting redress."  147 F.3d at 130.  However, the Complaint does not allege any misstatements or omissions with respect to these efforts to recruit investors.  To the extent Padulli attempts to make such allegations in his Declaration in opposition to Defendants' motions (<u>see</u> Padulli Decl. ¶¶ 8-9), this Court rejects them and finds that Yukos' recruitment of investors in the United States was merely preparatory to its fraud abroad.  As such, this action is distinguishable from <u>EOC</u> and cases following it.

       In the face of the overwhelmingly foreign nature of Defendants' alleged fraud, Plaintiffs have not established sufficient conduct by Defendants within the United States to confer federal subject matter jurisdiction over the putative class claims of Roxwell Holdings and Parsimony.

C.  <u>The Effects Test</u>

Under the effects test, "[a] federal court . . . has jurisdiction . . . where illegal activity abroad causes a 'substantial effect' within the United States."  <u>Alfadda v. Fenn</u>, 935 F.2d 475, 478 (2d Cir. 1991); <u>accord</u> <u>Consol. Gold Fields PLC v. Minorco, S.A.</u>, 871 F.2d 252, 262 (2d Cir. 1989); <u>Interbrew</u>, 23 F. Supp. 2d at 429.

1.  <u>Roxwell Holdings</u>

Roxwell Holdings is an off-shore corporation that purchased Yukos common stock on the Russian stock exchange.  (Roxwell Holdings Cert.)  Plaintiffs do not contend that Roxwell Holdings suffered any effects in the United States attributable to Defendants' alleged securities fraud.  Accordingly, this Court lacks subject matter jurisdiction over the claims of Roxwell Holdings.

2.  <u>Parsimony</u>

Plaintiffs contend that Parsimony suffered substantial effects of Defendants' alleged securities fraud in the United States in that its sole shareholder, Padulli, resided in New York throughout the Class Period.  (Padulli Decl. ¶ 2.)  Indeed, because Padulli was a United States resident during the Class Period, he has the same status as a United States citizen for purposes of the effects test.  <u>See</u> <u>EOC</u>, 147 F.3d at 128 n.12 ("U.S. residence of individual investors – not American nationality – must be the focus of the effects test.").

In <u>Itoba</u>, the Second Circuit found a sufficient effect in the United States to establish jurisdiction over an off-shore corporation's claims where fifty percent of the shareholders of its parent corporation were United States residents.  54 F.3d at 124.  However, the Court did not find jurisdiction solely because of the corporate ownership but because of a

"sufficient combination of ingredients of the conduct and effects test."  Itoba, 54 F.3d at 124.

That is, the Second Circuit interpreted the complaint in Itoba to allege a "fraud occurring on an

American exchange and persisting abroad that has impacted detrimentally upon thousands of

United States shareholders in the defrauded company."  Itoba, 54 F.3d at 124.

By contrast, with respect to the claims of Parsimony and the class of bondholders

that it seeks to represent, Defendants' alleged fraud lacks the significant nexus to United States

exchanges and investors that was critical to the Second Circuit's decision in Itoba.  Parsimony

seeks to bring class claims on behalf of a class of investors that purchased the UBS AG-issued

equity-linked bonds.  As discussed, those bonds were restricted from being "offered, sold or

delivered within the United States or to U.S. persons" and traded exclusively on the Luxembourg

exchange.  (Andreeva Decl. Ex. Q.)  Padulli's residence in this country was therefore

unforeseeable to Defendants.  See Euro Trade & Forfaiting, Inc. v. Vowel, No. 00 Civ. 8431

(LAP), 2002 WL 500672, at *10 (S.D.N.Y. Mar. 29, 2002) ("[T]here is no suggestion that the

intended and/or actual victims of the defendants' alleged fraudulent scheme are American

investors."); Interbrew, 23 F. Supp. 2d at 430 (finding an effect on U.S. investors insignificant

because "these investors were neither the intended nor the actual 'victims' of [the defendant's]

purported scheme to defraud"); cf. Consol. Gold Fields, 871 F.2d at 262 (finding subject matter

jurisdiction were an effect in the United States "was clearly a direct and foreseeable result of the

conduct outside the territory of the United States").  Parsimony's fortuitous connection to New

York is too gossamer to provide the minimal nexus for a class action in the United States.

As such, this Court lacks subject matter jurisdiction over Parsimony's putative

class claims on behalf of foreign bondholders.

III.  Failure to State a Claim

    A.  Legal Standards

        1.  Rule 12(b)(6)

For purposes of a motion to dismiss under Rule 12(b)(6), the well-pleaded factual allegations of the complaint are accepted as true, and all inferences are drawn in favor of the plaintiffs.  Flores v. S. Peru Copper Corp., 414 F.3d 233, 237 (2d Cir. 2003); Hartford Courant Co. v. Pellegrino, 380 F.3d 83, 89-90 (2d Cir. 2004).  The complaint is deemed to include "any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference, as well as public disclosure documents required by law to be, and that have been, filed with the SEC, and documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit."  Rothman v. Gregor, 220 F.3d 81, 88-89 (2d Cir. 2000) (citations omitted); see Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002); Brass v. Am. Film Techs., Inc., 987 F.2d 142, 150 (2d Cir. 1993); Allen v. WestPoint-Pepperell, Inc., 945 F.2d 40, 44 (2d Cir. 1991); Cortec Indus., Inc. v. Sum Holding, L.P., 949 F.2d 42, 47 (2d Cir. 1991).  The Court need not accept as true any allegations that are contradicted by documents deemed to be part of the complaint, or materials amenable to judicial notice.  Hirsch v. Arthur Andersen & Co., 72 F.3d 1085, 1092 (2d Cir. 1995); VTech Holdings, Ltd. v. Pricewaterhouse Coopers, LLP, 348 F. Supp. 2d 255, 263 (S.D.N.Y. 2004); Rapoport v. Asia Elecs. Holdings Co., 88 F. Supp. 2d 179, 184 (S.D.N.Y. 2000); Sazerac Co. v. Falk, 861 F. Supp. 253, 257 (S.D.N.Y. 1994).

Dismissal is appropriate only when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  Conley v. Gibson, 355 U.S. 41, 45-46 (1957); accord Jacobs v. Ramirez, 400 F.3d 105, 106 (2d Cir. 2005).  The issue on a motion to dismiss is not "whether a plaintiff will ultimately prevail but whether

[the plaintiff] is entitled to offer evidence to support the claims." Villager Pond, Inc. v. Town of Darien, 56 F.3d 375, 378 (2d Cir. 1995).

    2. Section 10(b) and Rule 10b-5

    Section 10(b) of the Exchange Act makes it unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may proscribe." 15 U.S.C. § 78j(b). Rule 10b-5, in turn, prohibits "mak[ing] an untrue statement of material fact or [omitting] to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b). To state a claim under either provision, plaintiffs must plead that the defendant "(1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury." Lentell v. Merrill Lynch & Co., 396 F.3d 161, 172 (2d Cir. 2005); accord Lawerence v. Cohn, 325 F.3d 141, 147 (2d Cir. 2003); In re IBM Corp. Sec. Litig., 163 F.3d 102, 106 (2d Cir. 1998); San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos., 75 F.3d 801, 808 (2d Cir. 1996).

    Moreover, a complaint alleging securities fraud under Section 10(b) must satisfy the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure. Lentell, 396 F.3d at 168; Kalnit v. Eichler, 264 F.3d 131, 138 (2d Cir. 2001). Under Rule 9(b), the circumstances constituting fraud must be stated with particularity, meaning that such allegations "must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Novak v. Kasaks, 216 F.3d 300, 306 (2d Cir. 2000) (internal

quotation omitted).  The PSLRA, similarly, requires that the complaint "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading," 15 U.S.C. § 78u-4(b)(1), and for each misstatement or omission alleged, "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," 15 U.S.C. § 78u-4(b)(2).

 With respect to both Plaintiffs' Tax Scheme Allegations and their Political Activity Allegations, Defendants contend that the Complaint inadequately alleges that Defendants (1) made material misstatements or omissions or (2) did so with scienter.

 B. <u>Tax Scheme Allegations</u>

  1. <u>Yukos' and Misamore's Misstatements and Omissions</u>

 An omission is actionable under the federal securities laws "only when the [defendant] is subject to a duty to disclose the omitted facts."  <u>In re Time Warner Inc. Sec. Litig.</u>, 9 F.3d 259, 267 (2d Cir. 1993); <u>accord</u> <u>Resnik v. Swartz</u>, 303 F.3d 147, 154 (2d Cir. 2002) ("Disclosure of an item of information is not required . . . simply because it may be relevant or of interest to a reasonable investor.").  Such a duty "arises whenever secret information renders prior public statements materially misleading, not merely when that information completely negates the public statements."  <u>Time Warner</u>, 9 F.3d at 268; <u>accord</u> <u>San Leandro</u>, 75 F.3d at 810.  Likewise, a misstatement is actionable only if the fact misstated is material.  17 C.F.R. § 240.10b-5.  "To fulfill the materiality requirement 'there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.'"  <u>Caiola v. Citibank, N.A., New York</u>, 295 F.3d 312, 329 (2d Cir. 2002) (quoting <u>Basic, Inc. v. Levinson</u>, 485 U.S. 224, 231-32 (1988)).  "The touchstone of the inquiry is not whether isolated statements within a

document were true, but whether defendants' representations or omissions, considered together and in context, would affect the total mix of information and thereby mislead a reasonable investor regarding the nature of the securities offered." Halperin v. eBanker USA.COM, Inc., 295 F.3d 352, 357 (2d Cir. 2002). "At the pleading stage, a plaintiff satisfies the materiality requirement . . . by alleging a statement or omission that a reasonable investor would have considered significant in making investment decisions." Ganino v. Citizens Utils. Co., 228 F.3d 154, 161 (2d Cir. 2000). "[A] complaint fails to state a claim of securities fraud if no reasonable investor could have been misled about the nature of the risk when he invested." Halperin, 295 F.3d at 359; accord Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985).

Plaintiffs claim that Yukos and, in some instances, its officers made four categories of statements during the Class Period that failed to disclose material facts concerning Yukos' alleged tax evasion scheme. First, the Complaint alleges that Yukos touted the Company's operational success and reported increasingly positive financial results that overstated profits and understated tax liability. (Compl. ¶¶ 5, 100, 102, 104, 106, 107, 114, 116.) Second, Yukos represented that its financial results were in conformity with U.S. GAAP and other established reporting standards. (Compl. ¶¶ 106, 109-10, 112, 114, 116.) Third, Yukos represented that it reduced its effective tax rate because certain of its subsidiaries took advantage of lower regional taxes. (Compl. ¶ 108.) Finally, the Complaint alleges that Yukos represented that it dealt at arms-length with related parties. (Compl. ¶¶ 109-10.)[4]

---

[4]  The Complaint advances other alleged misstatements, none of which are accompanied by a particularized allegation that they were false or misleading. First, the Complaint alleges that Yukos falsely described certain consolidation-related tax adjustments as "one time" events (Compl. ¶¶ 5, 100-01); that Yukos and Misamore misrepresented that the Company was "reviewing its tax accounting and expense polices" (Compl. ¶¶ 5, 101); and that Yukos falsely stated that it was "not expecting [profitability] to deteriorate" (Compl. ¶ 116). Each of these alleged misstatements lacks a particularized allegation of its falsity. (See Compl. ¶¶ 103(f), 117(a)). The Complaint also alleges that Misamore told investors that Yukos' tax liabilities could increase if regional tax benefits were eliminated. (Compl. ¶ 102.) However, Plaintiffs do

In challenging the sufficiency of the allegations of misstatements and scienter, Defendants contend that Yukos' tax strategies were not clearly illegal and that the consequences Yukos suffered in late 2003 and early 2004 were the unforeseeable result of a novel interpretation of Russian tax law. According to the Yukos Defendants: "At best, the losses of American investors in Yukos stock were due to the Russian Government adopting a new legal interpretation at odds with prior executive actions and court pronouncements. At worst, the Russian Government's actions were simply illegal." (Yukos Defs. Mem. at 20.)

### a.  Article 40

The Complaint alleges that the Yukos tax strategy amounted to an illegal "transfer pricing" scheme in violation of Article 40 of the Russian Federation Tax Code. (Compl. ¶¶ 49, 60, 77, 79, 147.) Transfer pricing "occurs when an entity (or its subsidiary) sells a product at below market prices to an affiliated entity either to avoid taxes or strip profits from one entity to another." (Compl. ¶ 49.) Enacted in 1999, Article 40 codifies the presumption that the price used in a transaction for goods is "consistent with market prices." Russian Fed'n Tax Code Art. 40 § 1 (Andreeva Decl. Ex. E). However, in transactions between "related parties" or in which the price diverges more than 20% "from the level of prices used by the taxpayer for identical goods . . . or goods . . . of the same kind within a short period of time," the Russian Tax Ministry is authorized to verify the propriety of the price used. Russian Fed'n Tax Code Art. 40 § 2. Where the price used is 20% higher or lower than the market price for identical goods or goods of a similar kind, the Tax Ministry is authorized to assess additional taxes and a penalty. Russian

---

not allege that regional tax benefits had been eliminated – only that the Russian Federation had limited their availability through the 90/70/70/70 rule. (Compl. ¶ 78.) As such, to the extent Plaintiffs' claims rely on these alleged misstatements, they are insufficient under Fed. R. Civ. P. 9(b) and the PSLRA, 15 U.S.C. § 78u-4(b)(1).

Fed'n Tax Code Art. 40 § 3.  Thus, Article 40 imposes substantial limitations on a company's ability to take advantage of transfer pricing.

Plaintiffs allege that Yukos sold oil to the regional trading companies at prices "well below-market" and "substantially below-market."  (Compl. ¶¶ 7, 62.)  However, the Complaint does not allege that Yukos diverged from the prevailing market price by at least 20%. Nor does the Complaint adequately allege that it was probable that the Tax Ministry would assert its authority under Article 40 to challenge the prices Yukos implemented in these transactions. See In re Flag Telecom Holdings, Ltd. Sec. Litig., 308 F. Supp. 2d 249, 265 (S.D.N.Y. 2004) (holding insufficient an allegation that defendants violated U.S. GAAP "because plaintiff . . . failed to plead any facts that indicate this impairment charge should have been recognized sooner than it was"); In re Par Pharm. Inc. Sec. Litig., 733 F. Supp. 668, 678 (S.D.N.Y. 1990) (holding that the securities laws do not require companies "to speculate as to the myriad of circumstances" that could ensue if an illegal scheme were uncovered).  Although Plaintiffs allege generally that "since 1999, the Tax Ministry and the Russian Courts had been cracking down on similar schemes" (Compl. ¶ 80), the Complaint describes not a single instance in which the Tax Ministry challenged related-company transactions that utilized "well below-market" prices. Tellingly, the Tax Ministry made no reference to Article 40 or its 20% price-differential threshold in the December 2003 Report or the April 2004 Resolution.  Rather, the crux of the April 2004 Resolution is that Yukos was at all times the true owner of the oil purportedly sold to the regional trading companies and that the trading companies were "dummy subsidiaries" that illegitimately took advantage of ZATO tax savings.  (Andreeva Decl. Ex. T at 1-4.) Accordingly, the Complaint fails to plead with particularity sufficient facts demonstrating that Yukos' tax strategy violated Article 40 of the Russian Federation Tax Code.

b. The 90/70/70/70 Rule

The Complaint also alleges that Yukos' tax strategy violated the so-called "90/70/70/70 Rule," and that Yukos made material misrepresentations to deceive the public about its compliance with that rule. (Compl. ¶¶ 78, 147.) In 1999, the Russian Federation enacted legislation to prohibit any company from registering with a ZATO for preferential tax treatment unless (1) it maintains 90% of its fixed assets and 70% of its operations within the ZATO; (2) 70% of its employees are permanent residents of the ZATO; and (3) 70% of its payroll is paid to permanent residents. (Compl. ¶ 78.) Because most of Yukos' assets – particularly its cash assets – were located in Moscow, the Complaint alleges that the trading companies failed to comply with the 90/70/70/70 Rule. (Compl. ¶¶ 14, 64-67.)

However, the Complaint does not allege with particularity that Yukos' alleged representations were false or misleading at the time they were made. Indeed, the Complaint points to only two authorities purportedly bearing on the application of the 90/70/70/70 Rule – Business Oil and a 2001 case involving Lukoil ("Lukoil") – neither of which is relevant to this action.[5] (Compl. ¶¶ 68-72, 81-83; Andreeva Decl. Exs. T, HH.) Business Oil was not decided until April 2004 – approximately six months after the close of the Class Period – and therefore cannot have had any bearing on Yukos' conduct during that period.[6] (Andreeva Decl. Ex. T, at 1.) And Lukoil, though decided in December 2001, is inapposite. (Andreeva Decl. Ex. HH.) That case did not involve the application of the 90/70/70/70 Rule at all; rather, it involved the

---

[5] Defendants also rely on audits of Yukos' tax payments from prior years which imposed comparatively modest additional liability on Yukos. However, the Complaint does not reference those audits and there is no evidence that Plaintiffs relied on them in bringing this action. See Rothman, 220 F.3d at 88. In any event, those prior audits examined only the prices employed in transactions between Yukos and its regional trading companies and not the structure of the trading companies or the transactions.

[6] Indeed, even the Russian Tax Ministry's initial findings in Business Oil date from December 29, 2003 – after the close of the Class Period. (See, e.g., Andreeva Decl. Ex. Q at 11, 76, 97, Ex. T at 5, 68, 89.)

interpretation of a treaty between the Russian Federation and Kazakhstan, pursuant to which the Kazakh town of Baykonur was to be treated as a ZATO for purposes of assessing Russian taxes. Baykonur sought to take advantage of this status to exempt the Russian corporate parent of a Kazakh subsidiary from the payment of Russian <u>federal</u> taxes, but the Supreme Court of the Russian Federation ruled that "[t]he legislation [at issue] . . . does not give local authorities, including the chief executive of the [ZATO], the right to establish breaks on federal taxes." (Andreeva Decl. Ex. HH at 4.)  Neither the treaty between Kazakhstan and the Russian Federation nor Russian federal taxes are at issue in this action.[7]

In any event, <u>Lukoil</u> pre-dated the April 2002 decision in another pre-class period tax case – <u>Pribrezhnoe</u> – which did involve the application of the 90/70/70/70 Rule in the context of regional taxes and which upheld tax practices virtually identical to those alleged in the Complaint.  (Andreeva Decl. Ex. WW.)  Pribrezhnoe LLC ("Pribrezhnoe") is an oil company that maintained only one fixed asset in the ZATO in which it was registered – a single computer – and lacked any operations or facilities for the production, storage or transportation of oil. (Andreeva Decl. Ex. WW.)  The Tax Ministry found that Pribrezhnoe violated the 90/70/70/70 Rule but the Federal Arbitration Court disagreed, holding that "conducting trade in oil products, i.e., executing purchase and sale agreements, does not require an organization to own appropriate fixed assets or to have said oil products in the . . . ZATO."  (Andreeva Decl. Ex. WW at 3.)

Accordingly, Plaintiffs have failed to allege the existence of any precedent to support their contention that Yukos made material misrepresentations relating to its compliance with the 90/70/70/70 Rule.  And Yukos can hardly have been expected to disclose the speculative possibility that it might be found guilty of tax evasion in the event <u>Pribrezhnoe</u> was

---

[7] More importantly for purposes of scienter, Plaintiffs do not allege that the Tax Ministry's enforcement action against Lukoil was known to Defendants or even publicly available at the beginning of the Class Period.

subsequently called into question.  See In re Open Joint Stock Co. Vimpel-Communications, No.

04 Civ. 9742 (NRB), 2006 WL 647981, at *6 (S.D.N.Y. Mar. 14, 2006) ("VimpelCom")

(dismissing securities fraud claims where plaintiffs did not allege how defendants should have

known an undisclosed tax investigation could lead to liability); see also In re Par Pharmaceutical,

Inc. Sec. Litig., 733 F. Supp. 668, 678 (S.D.N.Y. 1990) ("Defendants cannot be held liable for

failing to 'disclose' what would have been pure speculation."); Ballan v. Wilfred Am. Educ.

Corp., 720 F. Supp. 241, 248 (E.D.N.Y. 1989) (finding defendant had no duty to disclose the

existence of an ongoing government investigation whose eventual outcome was unknown).

       Further, Defendants did disclose the risks attendant to Russian tax legislation and

enforcement.  Throughout the Class Period, Yukos' public disclosures cautioned that "Russian

tax legislation is subject to varying interpretations and [periodic/constant] changes, which may

be retroactive" and that "transactions may be challenged by tax authorities and the Company

may be assessed additional taxes, penalties and interest. . . . Tax periods remain open to review

by the tax authorities for three years."  (Andreeva Decl. Ex. H at 11, Ex. I at 11, Ex. K at 25, Ex.

L at 27, Ex. M at 22, Ex. N. at 6, Ex. O at 6, Ex. P at 8.)  See also Halperin, 295 F.3d at 357

("Certain alleged misrepresentations in a stock offering are immaterial as a matter of law because

it cannot be said that any reasonable investor could consider them important in light of adequate

cautionary language set out in the same offering."); see also 15 U.S.C. §§ 77z-2, 78u-5 (statutory

safe harbor provisions).

      2.  Misamore

       The Complaint alleges that because Misamore signed Yukos' 2002 Annual Report

(Compl. ¶ 108), actionable misstatements therein are attributable to him as well as Yukos.  See

In re Atlas Air Worldwide Holdings, Inc. Sec. Litig., 324 F. Supp. 2d 474, 487 (S.D.N.Y. 2004);

In re WorldCom, Inc. Sec. Litig., 294 F. Supp. 2d 392, 417 (S.D.N.Y. 2003); In re Indep. Energy

Holdings PLC Sec. Litig., 154 F. Supp. 2d 741, 767 (S.D.N.Y. 2001), abrogated on other

grounds by In re Initial Public Offering Sec. Litig., 241 F. Supp. 2d 281 (S.D.N.Y. 2003).

However, this issue is moot in light of this Court's holding that Plaintiffs did not allege any

actionable misrepresentations or omissions concerning the Tax Scheme Allegations.  For the

same reason, Misamore's alleged misstatement of Yukos' profits in his April 3, 2003

presentation to investors in London is also insufficient to support a claim of securities fraud.

(Compl. ¶ 102.)


       3.  Menatep

Plaintiffs claim that Menatep controlled four of the regional trading companies,

owned the primary bank, and otherwise facilitated Yukos' tax-avoiding transactions.  (Compl. ¶¶

32, 35, 63-65, 73.)  However, Plaintiffs do not allege that Menatep made any misstatements or

had a duty to speak, and Section 10(b) does not provide a private right of action for aiding and

abetting.  Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164,

177 (1994) (Section 10(b) "prohibits only the making of a material misstatement (or omission) or

the commission of a manipulative act."); SEC v. U.S. Envtl., Inc., 155 F.3d 107, 112 (2d Cir.

1998).  Accordingly, Menatep is not liable as a primary violator under Rule 10b-5(b) for any

misstatements or omissions.

In their opposition papers, Plaintiffs also contend that Menatep is liable as a

primary violator under Rule 10b-5(a) and (c) for participating in the alleged tax scheme.  Those

provisions make it unlawful "(a) [t]o employ any device, scheme, or artifice to defraud, . . . or (c)

[t]o engage in any act, practice, or course of business which operates or would operate as a fraud

or deceit upon any person, in connection with the purchase or sale of any security."  17 C.F.R. §

240.10b-5(a), (c); see also Field v. Trump, 850 F.2d 938, 946-47 (2d Cir. 1988) (Section 10(b)

bars conduct "involving manipulation or deception, manipulation being practices, such as wash

sales, matched orders, or rigged prices, that are intended to mislead investors by artificially

affecting market activity." (internal quotations and citations omitted)).  Plaintiffs argue that

Menatep "substantially participated in the manipulative or deceptive tax scheme by directly or

indirectly employing a manipulative or deceptive device, i.e., the four sham entities."  (Plaintiffs'

Memorandum in Opposition to Motions to Dismiss ("Pls. Mem.") at 27 (internal quotations

omitted).)

   The Complaint, however, alleges only that Plaintiffs were misled by Yukos'

misstatements and omissions.  (Compl. ¶¶ 45, 129-31.)  In this Circuit, "where the sole basis for

[plaintiffs'] claims is alleged misrepresentations or omissions, plaintiffs have not made out a

market manipulation claim under Rule 10b-5(a) and (c)."  Lentell, 396 F.3d at 177.  Accordingly,

Plaintiffs' claims against Menatep under Section 10(b) of the Exchange Act and Rule 10b-5 are

dismissed.


   4.  Scienter

   To plead their Section 10(b) and Rule 10b-5 claims against Yukos and Misamore,

Plaintiffs must allege that each Defendant acted with "'an intent to deceive, manipulate or

defraud.'"  Ganino, 228 F.3d at 168 (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193

n.12 (1976)); see In re Merrill Lynch & Co. Research Reports Sec. Litig., 289 F. Supp. 2d 416,

426-27 (S.D.N.Y. 2003) ("Often lost in the enormous muddle of securities litigation is this most

basic of facts: not every knowing misrepresentation creates a legal cause of action under the

securities laws.").  The Complaint must "state with particularity the facts giving rise to a strong

inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2); see

Chill v. Gen. Elec. Co., 101 F.3d 263, 267 (2d Cir. 1996).  In this Circuit, Plaintiffs can plead a

"strong inference" of fraudulent intent either (a) by alleging "that defendants had both motive

and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial

evidence of conscious misbehavior or recklessness."  Kalnit, 264 F.3d at 138 (internal quotation

omitted); accord Rothman, 220 F.3d at 90; see also Novak, 216 F.3d at 310 (noting that the

PSLRA "did not change the basic pleading standard for scienter in this circuit").  In light of

Plaintiffs' failure adequately to plead any material misrepresentation, this Court addresses the

issue of scienter only for the sake of completeness.


a.  Motive and Opportunity

It is undisputed that Yukos and Misamore had the opportunity to commit

securities fraud.  To establish an adequate motive to commit securities fraud, Plaintiffs must

allege a motive that is concrete and personal to the defendant charged with making the

misstatement or omission.  Kalnit, 264 F.3d at 139; Novak, 216 F.3d at 307-08; In re Bayer AG

Sec. Litig., No. 03 Civ. 1546 (WHP), 2004 WL 2190357, at *14 (S.D.N.Y. Sept. 30, 2004).  The

complaint must allege more than "a generalized motive, one which could be imputed to any

publicly-owned, for-profit endeavor."  Chill, 101 F.3d at 268.  "Motives that are generally

possessed by most corporate directors and officers do not suffice."  Kalnit, 264 F.3d at 139.  The

Complaint alleges that Defendants had two distinct motives to commit fraud.

First, Plaintiffs allege that Defendants wanted to elevate the Company's stock

price to enable Yukos to acquire a competitor, Sibneft, without substantially diluting the value of

Yukos' shares in the combined company.  (Compl. ¶¶ 134-37.)  That transaction was announced in April 2003.  (Compl. ¶ 135.)[8]

"[I]n some circumstances, the artificial inflation of stock price in the acquisition context may be sufficient for securities fraud scienter."  Rothman, 220 F.3d at 93 (citing TimeWarner, 9 F.3d at 269).  But the incentive to boost stock price to stimulate an impending acquisition or optimize the terms for the corporation, without more, does not constitute an adequate motive to defraud investors.  See Kalnit, 264 F.3d at 141; Rombach, 355 F.3d at 177 (holding that a corporate transaction does not supply a cognizable motive absent an allegation of personal gain); AOL Time Warner, Inc. Sec. & "ERISA" Litig., 381 F. Supp. 2d 192, 218 (S.D.N.Y. 2004) (generalized allegations that company sought to inflate stock price to effectuate a merger are insufficient); cf. Rothman, 220 F.3d at 94 (desire to elevate stock price to facilitate acquisition of another company was, "in combination with the other allegations of the Complaint," adequate to allege scienter (emphasis added)).  For example, in Kalnit v. Eichler, the Second Circuit observed that "[a]chieving a superior [merger] agreement . . . does not demonstrate defendants' intent to benefit themselves at the expense of the shareholders because the shareholders themselves would benefit from a superior transaction."  264 F.3d at 140.  Rather, "the desire to achieve the most lucrative acquisition proposal can be attributed to virtually every company seeking to be acquired.  Such generalized desires do not establish scienter."  Kalnit, 264 F.3d at 141.

The Complaint alleges that Menatep, Khodorkovsky and Misamore "were highly motivated to artificially inflate the price of Yukos' stock through the illegal tax scheme . . . in order to [acquire] Sibneft using fewer shares of Yukos stock, thus preventing dilution of the

---

[8]  Defendants contend that the Sibneft acquisition could not have provided a motive because it supervened most of the tax years for which the Russian Federation charged Yukos with tax evasion.  However, the relevant motive relates to the allegedly fraudulent misstatements and omissions in 2003 – not the motive for underpaying taxes in prior years.

Company's stock." (Compl. ¶ 137.)  As alleged, such motive benefits all holders of Yukos stock, not just Menatep and Khodorkovsky.[9]  The Complaint does not allege that Defendants intended to profit from the Sibneft acquisition "at the expense of" other shareholders.  See Kalnit, 264 F.3d at 140.  Thus, Yukos' acquisition of Sibneft did not create a "concrete and personal" motive for Defendants to commit securities fraud.

Plaintiffs also allege that Menatep, Khodorkovsky and Lebedev, as Yukos shareholders, possessed a separate motive to fraudulently inflate Yukos' stock price in order to obtain larger dividends from the Company.  (Compl. ¶ 138.)  Generally, the bare allegation of a shareholder's incentive to maximize the corporation's stock price is insufficient to satisfy the scienter element of a securities fraud claim.  See Rombach, 355 F.3d at 177; Kalnit, 264 F.3d at 139-40; Acito v. IMCERA Group, Inc., 47 F.3d 47, 54 (2d Cir. 1995); Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1130 (2d Cir. 1994).  Because this incentive is common to all shareholders, it lacks the requisite "concrete and personal" nexus to the individual alleged to have made the misstatement or omission.  See Novak, 216 F.3d at 307-08; Acito, 47 F.3d at 54. Motive to increase the value of one's stock holdings is sufficient, however, if accompanied by allegations tending to show an individualized desire to benefit from the fraudulently elevated stock price, above and beyond the passive accretion of one's equity holdings.  For example, courts find motive adequately pled by an allegation that the shareholder engaged in "unusual" insider trading shortly after making the alleged misstatement or omission.  In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 74-75 (2d Cir. 2001); Rothman, 220 F.3d at 94; see Stevelman v. Alias Research Inc., 174 F.3d 79, 85 (2d Cir. 1999) ("The allegation supports the inference that [defendant] withheld disclosures that would depress his stock until he had profitably sold his shares.").

---

[9]  Misamore is not alleged to have owned stock in Yukos.

Here, Plaintiffs allege that Menatep, Khodorkovsky and Lebedev were motivated to defraud investors by the substantial dividends they received during the Class Period. In fact, the Complaint alleges that Menatep received approximately $1.2 billion in dividends during the Class Period, which it distributed to Lebedev and Khodorkovsky. (Compl. ¶¶ 138-39.) However, these Defendants benefited in the same way as all Yukos stockholders who also received dividends. The Complaint alleges merely the passive maintenance of stock positions and the receipt of dividends in due course, not "unusual insider trading activity during the [C]lass [P]eriod." See Stevelman, 174 F.3d at 85. For example, the Complaint does not allege that these Defendants sold off their holdings after realizing those dividends or increased their stock holdings just in time for Yukos to declare a dividend. Without an allegation differentiating Defendants' motives from those of every other Yukos shareholder, Plaintiffs allege nothing more than the generalized desire to maximize stock value. Thus, the Complaint fails to plead facts to support a strong inference that Menatep, Khodorkovsky or Lebedev had the motive to commit securities fraud.

### b. Conscious Misbehavior or Recklessness

Even if a plaintiff fails to plead scienter through allegations of motive and opportunity, the plaintiff may satisfy that element by alleging circumstances indicating the defendant's conscious misbehavior or recklessness. Kalnit, 264 F.3d at 142. Reckless conduct is "at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." In re Carter-Wallace, Inc. Sec. Litig., 220 F.3d 36, 39 (2d Cir. 2000) (internal quotation omitted); accord Rothman, 220 F.3d at 90; Chill, 101 F.3d at 269. A plaintiff can plead conscious misbehavior or

recklessness if he pleads facts that create a "strong inference" that a defendant (1) "engaged in deliberately illegal behavior"; (2) "knew facts or had access to information suggesting that [its] public statements were not accurate"; or (3) "failed to check information it had a duty to monitor."  Novak, 216 F.3d at 311.

    The Complaint alleges that Defendants "knew or were reckless in not knowing that the tax avoidance scheme was directly contrary to Russian law."  (Compl. ¶ 77; see Compl. ¶ 8.)  For the reasons discussed above, however, none of the Russian cases alleged in the Complaint holds that the 90/70/70/70 Rule applies here.  To the contrary, the one pre-class period case that the parties identify – the decision in Pribrezhnoe – supported Yukos' interpretation of the 90/70/70/70 Rule.  The allegations in the Complaint are thus insufficient to support an inference of conscious misbehavior or recklessness.  See In re Bristol-Myers Squibb Sec. Litig., 312 F. Supp. 2d 549, 567 (S.D.N.Y. 2004) (finding allegation of scienter inadequate without an allegation "that the accounting treatment adopted by [the corporation] was the subject of prior accounting rules or literature"); Funke v. Life Fin. Corp., 237 F. Supp. 2d 458, 468-69 (S.D.N.Y. 2002) (holding scienter allegations insufficient where the accounting rule allegedly violated was ambiguous and there were no pronouncements attempting to clarify it until after the corporation's alleged misstatements); VimpelCom, 2006 WL 647981, at *8 (finding allegation of scienter insufficient where complaint failed to set forth the reasons defendants knew or should have known that a tax inspection could result in adverse financial consequences).

    Further, with respect to Misamore, all of the Complaint's allegations concerning his knowledge of Yukos' tax strategy are pled generally and fail to differentiate in any way between Misamore and Khodorkovsky.  See In re BISYS Sec. Litig., 397 F. Supp. 2d 430, 440 (S.D.N.Y. 2005) ("[T]he group pleading doctrine has no effect on the PSLRA's scienter requirement.  It merely gives plaintiffs the benefit of the presumption that certain kinds of

statements were made by certain kinds of defendants.  It does not permit plaintiffs to presume the state of mind of those defendants at the time the alleged misstatements were made.").  For example, the Complaint alleges that Misamore and Khodorkovsky "had access to the adverse undisclosed information . . . via access to internal corporate documents . . . , conversations and connections with other corporate officers and employees, attendance at management and Board of Directors' meetings . . . and via reports and other information provided to them in connection therewith."  (Compl. ¶¶ 38, 40, 42.)  The Complaint alleges that both Misamore and Khodorkovsky were "directly involved in the day-to-day operations of the Company at the highest levels and [were] privy to confidential proprietary information concerning the Company and its business, operations, products, growth, financial statements, and financial condition." (Compl. ¶ 40.)

Plaintiffs' generalized group pleading allegations of Misamore's knowledge and access to information are insufficient as a matter of law to establish his conscious misbehavior or recklessness.  See, e.g., Kinsey v. Cendant Corp., No. 04 Civ. 0582 (RWS), 2005 WL 1907678, at *5 (S.D.N.Y. Aug. 10, 2005) ("[C]onclusory allegations that a corporate officer had 'access' to information that contradicted the alleged misstatements are insufficient to raise a strong inference of recklessness."); In re Health Mgmt. Sys. Sec. Litig., No. 97 Civ. 1865 (HB), 1998 WL 283286, at *6 (S.D.N.Y. June 1, 1998) ("[C]ourts have routinely rejected the attempt to plead scienter based on allegations that because of defendants' board membership and/or their executive managerial positions, they had access to information concerning the company's adverse financial outlook."); Glickman v. Alexander & Alexander Servs., Inc., No. 93 Civ. 7594 (LAP), 1996 WL 88570, at *14 (S.D.N.Y. Feb. 29, 1996) (rejecting motive allegations that "are purely conclusory and rely in whole on [the defendant]'s position as CEO . . . rather than on any conduct allegedly undertaken by him" and holding insufficient allegations of the defendant's

"unfettered access" to corporate records).  The Complaint makes no particularized allegation that Misamore knew about Yukos' tax strategies from 2000 through 2003 or the nature and structure of its affiliated regional trading companies.  See In re Cross Media Mktg. Corp. Sec. Litig., 314 F. Supp. 2d 256, 264 (S.D.N.Y. 2004) ("Plaintiffs do not allege that [an officer defendant] received specific reports that contained clear signs of unlawful business practices of which he should have known."); cf. Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC, 376 F. Supp. 2d 385, 404 (S.D.N.Y. 2005) (holding scienter adequately pled against a chief financial officer who purportedly had access to the pricing sheets at issue and who, "as one of only four principals and directors, . . . allegedly collaborated with the other Individual Defendants in their 'small suite of offices' and therefore had ample opportunity to become familiar with the [employees] who performed the pricing analyses"); AOL Time Warner, 381 F. Supp. 2d at 220-21 (holding scienter allegations sufficient where the complaint alleged specific conversations and meetings the defendant had in which he was told of potential revenue problems).  Nor is there any allegation that Misamore had reason to believe that Yukos' financial reports during the Class Period were misleading.

As such, Plaintiffs have failed to plead scienter adequately and their Section 10(b) and Rule 10b-5 claims based on the Tax Scheme Allegations are dismissed.


C.  The Political Activity Allegations

Plaintiffs allege that Yukos failed to disclose that "Khodorkovsky was actively engaged in 'professional political activities' . . . while at work at Yukos."  (Compl. ¶ 103(a).) However, there is nothing in the Complaint to support Plaintiffs' allegation that Khodorkovsky engaged in political activity "while at work."  To the extent Plaintiffs allege that Yukos failed to disclose that Khodorkovsky was politically active, such a non-disclosure, even if true, was

immaterial in light of the wealth of publicly available information to that effect.  In fact, the

newspapers were saturated with references to Khodorkovsky's pro-Yeltsin, anti-Putin proclivity.

See, e.g., Arkady Ostrovsky, Yukos Arrest Puts Pressure on Russian Oligarch: Putin's

Confrontation with the Country's Business Leaders Appears to Have Entered a New Phase, Fin.

Times, July 4, 2003, at 8; Andrew Jack, Suitors Turn Blind Eye to Yukos Crisis: Western Oil

Groups Are Undeterred by Probes into the Russian Giant, Fin. Times, Aug. 5, 2003, at 27;

Andrew Jack, Oil Giant Drills Directors in Using Good Governance, Fin. Times, Mar. 24, 2003,

at 11; Geoffrey T. Smith, Khodorkovsky Raises the Stakes, Dow Jones Int'l, July 29, 2003; Paul

Starobin, Five Years After the Great Ruble Crash, the Economy Is Booming. But How Much Is

Russia Really Changing?, Bus. Week, Aug. 4, 2003, at 16; Andrew Jack, Yukos Affair Has

Russia's Oligarchs Squirming in Their Seats, Fin. Times, Aug. 13, 2003, at 6.[10]  Thus, even if

Yukos failed to make that fact explicit, no reasonable juror could find "a substantial likelihood

that the disclosure of the omitted fact would have been viewed by the reasonable investor as

having altered the 'total mix' of information made available."  Halperin, 295 F.3d at 357; see

Ganino, 228 F.3d at 167 (holding that a misstatement or omission is not material if the

undisclosed fact is already in the public domain); see also White v. H&R Block, Inc., No. 02

Civ. 8965 (MBM), 2004 WL 1698628, at *12 (S.D.N.Y. July 28, 2004) (dismissing claims

because the allegedly omitted fact was disclosed in the press).  In fact, Plaintiffs themselves

admit that "investors were aware that Khodorkovsky was politically active."  (Pls. Mem. at 19.)

    Plaintiffs also allege that "Yukos failed to disclose the material risk to Yukos

shareholders caused by the political actions taken by . . . Khodorkovsky."  (Compl. ¶ 103(b).)

That is, Plaintiffs seek to hold Defendants liable for failing to disclose a secret meeting with the

---

[10]  This Court may take judicial notices of these articles on a motion to dismiss without
transforming it into a motion for summary judgment.  See Kramer v. Time Warner, Inc., 937
F.2d 767, 773 (2d Cir. 1991); In re Merrill Lynch Tyco Research Sec. Litig., No. 03 Civ. 4080
(MP), 2004 WL 305809, at *4 n.3 (S.D.N.Y. Feb. 18, 2004).

Russian President in which the head of state agreed to refrain from investigating illegal activity.

However, the failure to disclose Putin's alleged threat to Khodorkovsky does not render

materially misleading Yukos' statement that "Company employees are prohibited from engaging

in political activities" (Compl. ¶ 99), or any other misstatement alleged in the Complaint.  That

is, none of the alleged misstatements could have given an investor the false impression that there

was no risk to the Company if Khodorkovsky was politically active.

    In any event, Putin's 2000 meeting with Khodorkovsky and other oligarchs was

publicly reported in major international news media.  For example, the <u>New York Times</u>

reported:

> President Vladimir V. Putin convened a meeting with Russian
> tycoons today to impress on them that he, ultimately, is the one
> who runs the country.
>
> At the end of the session at the Kremlin, some business leaders
> said they were prepared to forgo special treatment and abide by
> government rules – if the Kremlin could create a fairer business
> climate.
>
> In return, they said, they had won Mr. Putin's assurance that they
> could hold onto their wealth . . . .
>
> It is not clear whether Mr. Putin is really prepared to challenge
> vested interests and clean up government or whether his intent is to
> make the tycoons subservient to himself and punish those who
> failed to support him.

Sabrina Tavernise, <u>Putin, Exerting His Authority, Meets with Russia's Tycoons</u>, N.Y. Times,

July 29, 2000, at A3.  Similarly, the <u>Financial Times</u> reported "[t]he result [of the meeting] was a

statement of good intent on both sides, with the oligarchs signaling a retreat from politics and the

new president a more careful approach to enforcing the law."  John Lloyd, <u>Sounding the Retreat</u>

<u>from Russia's Rule of Wealth</u>, Fin. Times, Aug. 5, 2000, at 1.  Both articles note that

Khodorkovsky attended the meeting.

Under the "truth on the market" theory, "a misrepresentation is immaterial if the information is already known to the market because the misrepresentation cannot then defraud the market." Ganino, 228 F.3d at 167.  To neutralize a misstatement or omission, the information already in the public domain "must be conveyed to the public 'with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by' the alleged misstatements[]." Ganino, 228 F.3d at 167 (quoting In re Apple Computer Sec. Litig., 886 F.2d 1109, 1116 (9th Cir. 1989)).  Given the detail with which these two major international newspapers reported on Putin's meeting with the oligarchs, no reasonable investor could have been misled by Yukos' alleged failure to disclose that Putin threatened political retaliation if Khodorkovsky did not refrain from political activity.

Moreover, Plaintiffs' scienter allegations stem from the Russian Federation's arrest of two other oligarchs, Boris Berezovsky and Vladimir Gusinsky, who openly criticized Putin.  (Compl. ¶¶ 89-92.)  However, the Complaint does not allege that their arrests were specifically known by Yukos or any of the Defendants.  If Plaintiffs are alleging that Defendants knew of these arrests because they were public knowledge, the investing public also was well-aware of the risks of the oligarchs' political activity following Putin's meeting in 2000.

Accordingly, the Complaint fails to state a claim under Section 10(b) and Rule 10b-5 for misstatements and omissions with respect to the Political Activity Allegations.

### D.  Control Person Liability

Plaintiffs assert "control person" claims against Misamore and Menatep.  Section 20(a) of the Exchange Act provides that "[e]very person who, directly or indirectly, controls any person liable [for a § 10(b) or Rule 10b-5 violation] . . . shall also be liable jointly and severally with and to the same extent as such controlled person."  15 U.S.C. § 78t(a).  To make out a prima

facie case of control person liability under Section 20(a), "a plaintiff must show a primary

violation by the controlled person and control of the primary violator by the targeted defendant,

and show that the controlling person was in some meaningful sense a culpable participant in the

fraud perpetrated by the controlled person."  SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1472

(2d Cir. 1996) (citation and internal quotation omitted); accord Ganino, 228 F.3d at 170.

Because Section 20(a) requires proof that the defendant acted with a particular state of mind, the

PSLRA requires that, like scienter, the "culpable participation" element of control person

liability must be pled with particularity.  In re Global Crossing, Ltd. Sec. Litig., No. 02 Civ. 910

(GEL), 2005 WL 2990646, at *8 (S.D.N.Y. Nov. 7, 2005); Bayer, 2004 WL 2190357, at *16;

Mishkin v. Ageloff, No. 97 Civ. 2690 (LAP), 1998 WL 651065, at *25 (S.D.N.Y. Sept. 23,

1998); see 15 U.S.C. § 78u-4(b)(2) (applying a heightened pleading standard to "any private

action arising under this chapter in which the plaintiff may recover money damages only on

proof that the defendant acted with a particular state of mind").

      As discussed above, the Complaint fails to state a claim for primary liability on

either the Political Activity Allegations or the Tax Scheme Allegations.  As such, no defendant

can be subject to control person liability on those claims.  See Ganino, 228 F.3d at 170; First

Jersey, 101 F.3d at 1472.  Moreover, even if Plaintiffs had adequately pled a primary violation

on the Tax Scheme Allegations, there are reasons specific to both Misamore and Menatep that

require the dismissal of the claims against each defendant.

      1.    Misamore

      The claims against Misamore arising out of the Tax Scheme Allegations must also

be dismissed because, as already discussed, the Complaint fails to allege his scienter.  See Bayer,

2004 WL 2190357, at *16.

2.    Menatep

Likewise, the Complaint fails to allege Menatep's motive to commit securities fraud.  Thus, to plead Menatep's culpable participation in Yukos' alleged misstatements in connection with the Tax Scheme Allegations, the Complaint must allege that Menatep exhibited conscious misbehavior or recklessness.

The Complaint alleges that Menatep owned and controlled at least four of the trading companies and the principal bank through which profits from the regional trading companies were funneled back to Yukos.  (Compl. ¶¶ 7, 32, 73.)  However, the documents on which Plaintiffs expressly rely establish, at most, that Menatep owned the company that owned 61% of Yukos and that Yukos, in turn, owned the trading companies.  (See Compl. ¶ 32.)  The April 2004 Resolution makes no mention of Menatep, and Yukos' October 23, 2003 submission to the SEC states only that each of the four trading companies which Menatep is alleged to have owned "belongs to the group of entities, to which the Joint-Stock Company belongs." (Declaration of Robert A. Horowitz, dated June 3, 2005, Ex. A at 8, 20, 36, 38-39.)  As such, the Complaint fails to allege Menatep's direct involvement in or ownership of the trading companies.  Moreover, the allegation that Menatep was at the apex of a multi-layered corporate pyramid is insufficient to establish Menatep's conscious misbehavior or recklessness with respect to ZATO tax benefits of trading companies at the pyramid's base.  Finally, the Complaint does not allege that Menatep's bank ownership invested it with knowledge or a reason to know of the trading companies' structure.

The Complaint alleges no particularized facts of Menatep's culpable participation in Yukos' allegedly fraudulent misstatements and omissions.  Consequently, Menatep cannot be held liable under Section 20(a) as a control person.

## CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss and Yukos' motion for reconsideration are granted. This Court's March 30, 2006 Memorandum and Order is vacated. The claims of Plaintiffs Roxwell Holdings Limited and Parsimony Ltd. are dismissed for lack of subject matter jurisdiction without leave to replead. Plaintiff Mykola Buinycki's claims against Defendants Yukos Oil Company, Bruce K. Misamore and Group Menatep Limited are dismissed with leave to replead.

The Clerk of Court is directed to mark this case closed.

Dated:   October 25, 2006
         New York, New York

SO ORDERED:

WILLIAM H. PAULEY III
U.S.D.J.

*Counsel of Record:*

Samuel H. Rudman, Esq.
Robert M. Rothman, Esq.
David A. Rosenfeld, Esq.
Lerach Coughlin Stoia Geller Rudman & Robbins LLP
58 South Service Road, Suite 200
Melville, New York  11747
*Lead Counsel for Purchasers of Yukos Common Stock and ADRs*

Brian P. Murray, Esq.
Lawrence D. McCabe, Esq.
Murray Frank & Sailer LLP
275 Madison Avenue, Suite 801
New York, New York  10016
*Lead Counsel for Purchasers of Yukos Bonds*

Colby A. Smith, Esq.
Jeffrey S. Jacobson, Esq.
Erich O. Grosz, Esq.
Svetlana M. Eisenberg, Esq.
Debevoise & Plimpton LLP
919 Third Avenue
New York, New York  10022
*Counsel for Defendants Yukos Oil Company and*
*Bruce K. Misamore*

Robert A. Horowitz, Esq.
Jae Jung Kim, Esq.
Greenberg Traurig, LLP
200 Park Avenue
New York, New York  10166
*Counsel for Defendant Group Menatep Limited*